# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: October 13, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| JANELL ROSS, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 17-1992V |
| | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Ruling on Entitlement; Influenza |
| AND HUMAN SERVICES, | * | (Flu); Shoulder Injury Related to |
| | * | Vaccine Administration (SIRVA); |
| Respondent. | * | Table Injury. |
| | * | |
| * * * * * * * * * * * * * | | |

*Leah V. Durant,* Law Offices of Leah Durant, Washington, D.C., for petitioner.
*Colleen C. Hartley,* U.S. Department of Justice, Washington, D.C., for respondent.

## RULING ON ENTITLEMENT[1]

On December 20, 2017, Janell Ross("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2]  Petitioner alleges that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of receiving an influenza ("flu") vaccination in her left arm on January 9, 2017.  Petition (ECF No. 1).

After a review of the record as a whole, including expert reports, medical records, affidavits and briefing by the parties, and for the reasons set forth below, I find by preponderant evidence that the petitioner is entitled to compensation.

## I.      Procedural History

---

[1] Pursuant to the E-Government Act of 2002, see 44 U.S.C. § 3501 note (2012), **because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.**  The Court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  Before the opinion is posted on the Court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes  medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of  privacy."  Vaccine Rule 18(b).  An objecting party must provide the Court with a proposed redacted version of the opinion.  *Id.*  **If neither party files a motion for redaction within 14 days, the opinion will be posted on the Court's website without any changes.**  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Petitioner filed her petition on December 20, 2017, alleging she sustained a left shoulder injury caused by the influenza vaccine administered to her on January 9, 2017. Petition at Preamble. The case was initially referred to the Special Processing Unit ("SPU"). On February 20, 2018, then-Chief Special Master Dorsey filed a scheduling order directing petitioner to file an expert report, along with additional medical records. Scheduling Order (ECF No. 9).

On June 18, 2018, petitioner filed updated medical records. Petitioner's ("Pet.") Exhibits (Exs.") 9 & 10 (ECF No. 14). On July 30, 2018, petitioner filed a supplemental affidavit. Pet. Ex. 13. (ECF no. 21). Petitioner field an expert report from Dr. Lesley J. Anderson[3] on September 18, 2018. Pet. Ex. 14 (ECF No. 25). Afterwards, on October 19, 2018, respondent filed a status report stating that he had completed a review of this case and wished to engage in settlement negotiations. Respondent's ("Resp.") Status Report ("Rept.") (ECF No. 29). The parties began to engage in settlement negotiations.

On July 18, 2019, a status conference was held where the parties explained that they had reached an impasse in their attempts to resolve the case informally. Scheduling Order (ECF No. 43). On September 12, 2019, the parties filed a joint status report stating that respondent sought the opportunity to file the Rule 4(c) report. Joint Status Rept. (ECF No. 44).

On November 13, 2019, respondent filed his Rule 4(c) report recommending against compensation. Resp. Rept. at 1 (ECF No. 46). Specifically, respondent stated that petitioner's pain and reduced range of motion were not limited to the shoulder in which the vaccine was administered and he argued that the medical records provide an alternative explanation for her presentation. *Id.* at 6-7.

The case was reassigned to my docket on March 30, 2020. Order Reassigning Case (ECF No. 48). I held a status conference with the parties on June 4, 2020. During the status conference, I explained that it had appeared that petitioner had a "high likelihood of establishing that she suffered a SIRVA to her left shoulder after receiving the flu vaccination on January 9, 2017." Scheduling Order (ECF No. 52). Respondent requested the opportunity to file an expert report. *Id.* at 2.

On July 2, 2020, respondent filed an expert report from Dr. Paul J. Cagle[4] and accompanying medical literature. Resp. Exs. A-A Tab 40. On the same day, August 3, 2020, the

---

[3] Dr. Lesley J. Anderson is a Board-Certified Orthopedic Surgeon. Pet. Ex. 15 at 2. She graduated from Penn State University in 1972 and received her medical degree from the Penn State College of Medicine in 1976. *Id.* Dr. Anderson did her residency at the UCLA Department of Orthopaedic Surgery from 1979-1983. *Id.* at 1. Since 1985, Dr. Anderson has been an orthopaedic surgeon specializing in Arthroscopy and Surgery of the Knee and Shoulder. *Id.* Further, she is affiliated with multiple hospitals in San Francisco, California. *Id.* Dr. Anderson has held a teaching position at the Department of Orthopedic Surgery at UCSF. *Id.* at 2. Further, she is a member of many different medical associations, including the Ruth Jackson Orthopedic Society and California Orthopedic Association. *Id.* She has authored or co-authored multiple articles about orthopedic topics. *Id.* at 2-3.

[4] Dr. Paul Cagle is a Board-Certified Orthopaedic Surgeon. Resp. Ex. A at 1. He is an Assistant Professor and Associate Program Director in the Department of Orthopaedic Surgery at the Icahn School of Medicine at Mount Sinai. *Id.* He is a member of the American Academy of Orthopaedic Surgeons and the American Orthopaedic Association. *Id.* He stated that his current practice focuses on the shoulder which represents approximately 95% or more of the patients he treats. *Id.* at 1.

parties filed Memorandums in support of their positions regarding petitioner's pain and suffering.  Resp. Memo (ECF No. 57); Pet. Memo (ECF No. 58).  I held another status conference on December 3, 2020.  I explained that petitioner had a credible SIRVA claim and that the experts appeared to be in agreement that petitioner *did not* have a nerve injury. Scheduling Order at 3 (ECF No. 61).  I ordered the parties to file a joint status report indicating if the case can be resolved informally or if further proceedings need to be set.  *Id.* at 4.

After another status conference held on January 21, 2021, I ordered petitioner to file additional evidence in support of her claim and file a motion for a ruling on the record. Scheduling Order (ECF No. 65).  On February 26, 2021, petitioner filed a motion for a ruling on the record.  Pet. Motion ("Mot.") (ECF No. 67).  Respondent filed a response to petitioner's motion on April 29, 2021.  Resp. Response (ECF No. 73).  Petitioner filed a reply on May 6, 2021.  Pet. Reply (ECF No. 74).

This matter is now ripe for adjudication.

## II.    Evidence Submitted

### a.  Petitioner's Medical Records

On January 9, 2017, petitioner presented to her primary care physician, Dr. Sunita Gaur, for a follow-up from lab testing, elevated blood pressures and nose bleeds. Pet. Ex. 2 at 36.  In the "History of Present Illness," it was noted that petitioner's blood pressure had been increasing over the course of a few weeks, that she does not exercise, and she was experiencing frequent nose bleeds on the left side.  *Id.* at 37.  During the physical exam, her musculoskeletal exam was marked as, "Normal range of motion," and her neurological exam was normal.  *Id.* at 37.  It was during this visit that petitioner received the Fluzone.  *Id.* at 38.  The site of administration was not documented.

On January 24, 2017, petitioner called her primary care physician "to report left arm pain following flu shot on 1/9."  *Id.* at 41.  The call documentation note states that petitioner reported, "pain started 1 day after injection and she states she could barely move arm.  States pain resolved and on 1/13 she was helping move boxes and symptoms returned as they had been 1 day post injection.  States pain resolved again and then reoccurred on 1/20 when she was vacuuming."  *Id.* at 41.

Petitioner had an in-office visit the following day, January 25, 2017.  Pet. Ex. 2 at 43. This appointment was for "left shoulder pain and numbness since flu vaccine x 2 weeks."  *Id.*  In the "History of Present Illness," it stated, "Patient came in today complaining of pain and stiffness of the left shoulder since 01/10/2017.  She had a flu shot in the arm on 01/09/2017. States that she had a sore arm that day the following day.  The pain in the arm and stiffness persisted the following few days and then started to get better.  As she started to do her normal household activities the pain and stiffness returns.  Stated that she did not have any problem with [t]his shoulder prior to the flu shot."  *Id.*  Petitioner also denied any injuries or unusual physical activities.  *Id.*  During the physical exam of her left shoulder, petitioner demonstrated slight tenderness "over the proximal deltoid close to the joint.  Decreased range of motion in all

direction, primarily abduction and extension due to pain." *Id.* at 44.  She had full range of passive motion and was negative for the arm drop test and Hawkins test.  *Id.*  Dr. Gaur diagnosed petitioner with, "Acute pain of left shoulder, apparently symptoms started after she had the flu shot on 01/09/2017.  Examination consistent with acute bursitis." *Id.* at 44.  Dr. Gaur referred petitioner to physical therapy and prescribed her meloxicam.  *Id.*

On January 27, 2017, petitioner presented to Endeavor Physical Therapy & Wellness for her first physical therapy evaluation and appointment.  Pet. Ex. 4 at 41.  In the "History of Present Condition/Mechanism of Injury," it was recorded that petitioner is a 64 year-old woman with an approximately two week history of left shoulder pain after having a flu shot.  *Id.* Further, it noted, "No previous history of issues [with] this region despite R shoulder and cervical spine issues in the past.  She feels that when the shot was administered, the needle entered her glenohumeral joint." *Id.*  Petitioner reported that her pain level was a 7 out of 10.  *Id.* The physical exam revealed that she had a decreased flexion in the left shoulder (0-110 degrees) compared to the right shoulder (0-150 degrees); decreased abduction in the left shoulder; and decreased internal rotation as well.  *Id.*  She was assessed with "signs and symptoms consistent with [L][5] shoulder pain of uncertain origin.  Possible relationship to recent injection given in the region; Also possible connection to scapular asymmetry/dyskinesia and underlying movement pattern disorders.  [Patient] will benefit from skilled PT intervention to address these issues." *Id.*

On March 2, 2017, petitioner had an in-office visit with her primary care physician, Dr. Gaur.  Pet. Ex. 2 at 47.  Dr. Gaur noted that petitioner had demonstrated "significant pain on abduction and extension," and "due to pain of shoulder [it was] felt to be impingement syndrome." *Id.* at 47.  She recorded that petitioner had finished 6 weeks of physical therapy and had about a 50% response, but that she still had significant pain and was having difficulty using her left arm for day-to-day activities.  *Id.*  Petitioner reported that she was having difficulty sleeping on her left side.  *Id.*  Dr. Gaur also wrote, "Patient tends to believe that the problem is related to the flu vaccine." *Id.*  The examination of the left shoulder revelated that she had a "painful rotator arc between 70-110 degree[s].  Localized tenderness.  No asymmetry or deformity." *Id.* at 48.  Dr. Gaur diagnosed petitioner with left shoulder bursitis and wrote, "patient believes that [it] is related to the flu vaccine given to her on 01/09/2017." *Id.* at 48. Petitioner was referred to an orthopedist.  *Id.*

Petitioner presented to Austin Sports Medicine on April 4, 2017.  Pet. Ex. 6 at 10.  Under "History," it was recorded that petitioner is a right-handed female with problems of the left shoulder that began on 01/09/2017.  *Id.*  The record states, "She describes receiving a flu shot that day with soreness the same day.  She then noted dramatic increase in pain the following day with inability to "move the arm."  Over the next several days, pain and stiffness improved to the point where she can begin range of motion.  After five days, however, she states the arm was "frozen."  Two weeks post-injection physical therapy was instituted." *Id.*  Petitioner reported that her range of motion remains limited, and she is aware of the pain at night.  *Id.*  The physical exam of the left shoulder showed that petitioner had slight deltoid atrophy, active forward elevation to 90 degrees, and active abduction was "limited." *Id.*  Both external and internal

---

[5] Under "Assessment/Diagnosis" in these records, it consistently states that petitioner had "R" shoulder pain; however, the "Diagnosis" section of the physical therapy is: ICD10: M25.512: Pain in left shoulder."  Pet. Ex. 4. The notation under the Assessment/Diagnosis appears to be a typographical error.

rotation were limited. *Id.* Additionally, she had tenderness over the "lateral aspect of the shoulder overlying the mid one-third of the deltoid," and "Slight pain and weakness…with resisted external rotation." *Id.* Dr. E. Carey Windler diagnosed petitioner with "left shoulder pain, early arthrofibrosis, possible deltoid/axillary nerve injury," and recommended that petitioner undergo an EMG and nerve conduction study. *Id.*

Petitioner had an EMG/nerve conduction study ("NCS") on April 10, 2017. Pet. Ex. 6 at 28. The EMG revealed "membrane instability in the left supraspinatus and infraspinatus with neuropathic motor unit potentials. The left deltoid only showed decreased recruitment without axonal denervation." *Id.* at 27. The impression of the EMG/NCS was "left suprascapular neuropathy," and "decreased recruitment without axonal denervation in the left deltoid." *Id.*

After petitioner's EMG, she had a follow-up appointment with Dr. Windler. Pet. Ex. 6 at 9. Dr. Windler noted that petitioner continues to have pain and loss of motion. *Id.* She reviewed the EMG/NCS from April 10, 2017 and explained that findings of the study included axonal denervation of the supraspinatus and infraspinatus muscles "consistent with left suprascapular neuropathy." *Id.* She opined, "There is the possibility of infectious neuropathy due to the vaccine." *Id.* Dr. Windler recommended that petitioner have an MRI of her left shoulder and a possible intraarticular injection. *Id.*

On April 14, 2017, petitioner had an MRI of her left shoulder, which showed, "Thickening of the anterior band of inferior glenohumeral ligament and signal abnormality in the rotator interval highly suggestive of adhesive capsulitis and a partial interstitial tear of the conjoined tendon involving the posterior fibers of the supraspinatus tendon and the anterior leading edge of the infraspinatus tendon at their junction." Pet. Ex. 5 at 3. On April 19, 2017, petitioner saw Dr. Windler again. After reviewing petitioner's MRI and performing an examination of her left shoulder, Dr. Windler diagnosed petitioner with "left shoulder pain with findings [consistent with the MRI] and early arthrofibrosis. Pet. Ex. 6 at 8. Under "Plan," Dr. Windler wrote, "Her symptoms are secondary to pain post flu injection, potential neurological changes, and subsequent development of arthrofibrosis. I recommended a trial of intraarticular corticosteroid injection coupled with physical therapy and home exercises." *Id.*

On April 27, 2017, petitioner had a left shoulder articular injection with steroid. Pet. Ex. 6 at 39. Her pre-operative and post-operative diagnoses were listed as, "Shoulder pain," and "Adhesive capsulitis." *Id.*

On May 1, 2017, petitioner returned to physical therapy. Pet. Ex. 6 at 46. Under "Chief Complaint," it noted that petitioner was referred with left shoulder pain, adhesive capsulitis and neuropathy of suprascapular nerve. *Id.* Petitioner reported that her pain and loss of function began after the flu shot she received on January 9, 2017. *Id.* Petitioner reported her current pain at a 5 out of 10, with the worst being an 8 out of 10. The physical exam showed significant reduction in shoulder mobility compared to her right and her strength was recorded at a 3 out of 5. *Id.* at 47. Petitioner also had moderate tenderness to palpation on her lateral shoulder and on the infraspinatus. *Id.* The recommended plan was for petitioner to participate in physical therapy twice a week for 10 weeks. *Id.* at 48.

In June 2017, petitioner underwent a right knee arthroscopy with meniscectomy and chondroplasty. Pet. Ex. 3 at 29-30. Her physical therapy was then focused on her right knee and left shoulder. On July 18, 2017, the physical therapy note stated, "[Petitioner] is doing better with her left shoulder now being able to tolerate more ROM activities with less pain involved." *Id.* at 44. Her left shoulder active range of motion showed improvement from her assessment on May 1, 2017 and her strength had increased to a 4 out of 5. *Id.* at 45.

On July 20, 2017, petitioner had a follow-up appointment with Dr. Windler. Pet. Ex. 6 at 2. Petitioner reported she had felt improvement in range of motion and in strength in her left shoulder. *Id.* When examined, petitioner demonstrated forward elevation of 110 degrees and described minimal pain with resisted motion. *Id.* Dr. Windler assessed petitioner with, "Left shoulder-resolving pain, improving range of motion." *Id.* at 2.

On September 12, 2017, petitioner had a follow-up appointment with Dr. Gaur for acquired hypothyroidism. Pet. Ex. 9 at 37. Dr. Gaur wrote, "Patient has been suffering with frozen shoulder of the left shoulder…this started after she had the flu vaccine last year." *Id.* at 41. An examination of the left shoulder demonstrated decreased range of motion in all directions, but primarily on abduction and full extension due to pain. *Id.* at 42. Dr. Gaur made a referral to physical therapy for petitioner for "adhesive capsulitis of the left shoulder." *Id.* at 44.

Petitioner continued to participate in physical therapy for her left shoulder, along with her bilateral knees post-surgery. *See* Pet. Ex. 18. On November 14, 2018, petitioner had an appointment with Dr. Fernandez who performed another EMG/NCS. *Id.* at 16. The EMG results were normal. *Id.* Dr. Fernandez wrote, "The previous suprascapular neuropathy has resolved and is not seen on today's study." *Id.* He noted that there was "no evidence of residual nerve issues about the shoulder. Symptoms seem to be related to her joint capsule and improves with physical therapy." *Id.*

On January 15, 2020, petitioner had a follow-up appointment with Dr. Windler. Pet. Ex. 18 at 4. Petitioner reported overall improvement in the shoulder and intermittent pain. *Id.* Petitioner stated that she felt has improved by 60%. *Id.* The physical examination of her left shoulder showed slight deltoid atrophy, but full forward elevation and abduction. Petitioner had slight restriction in internal rotation and no significant pain with resisted rotation or abduction. *Id.* Dr. Windler assessed petitioner with "Left shoulder-resolving arthrofibrosis." *Id.*

On February 11, 2020, petitioner returned to physical therapy for her left shoulder. *Id.* at 2. Petitioner explained that she was having difficulty with activities of daily living due to the weakness in her left shoulder and was having difficulty falling asleep at night due to the pain. *Id.* She described her pain as a 2 out of 10 and a 5 out of 10 at its worst. *Id.* Physical therapy was recommended twice a week for eight weeks. *Id.* at 3.

### b. Affidavits Filed

#### 1. Petitioner's Affidavit

Petitioner filed an affidavit, executed on July 27, 2018.  Pet. Affidavit ("Aff.") (ECF No. 21).  On August 7, 2017, prior to her petition being filed, petitioner was contacted by a paralegal with petitioner's counsel office, informing her that the proof of vaccination was missing from her medical records.  Pet. Aff. at ¶ 1.  Petitioner stated she emailed "Ciox Health," where she had received the January 9, 2017 vaccine and requested the vaccination record.  *Id.* at ¶ 2.  Petitioner stated that she contacted Ciox Health after waiting three weeks with no response.  *Id.* at ¶ 3.  She stated that then "Kerry," a Ciox employee, emailed petitioner the record.  *Id.* at ¶ 4.  Petitioner stated that she reviewed the information when she received it and saw that "critical information concerning my vaccine administration was missing."  *Id.*

Petitioner contacted Ciox again and Kerry informed the petitioner that the barcode label contained the vaccine administration details that were needed, but that she could not print or send the flu vaccine bar code label because it was not readable when transmitted.  *Id.* at ¶ 5.  Petitioner stated that Kerry, the employee at Ciox, read the information from the vaccine label, which petitioner then transferred onto the form herself.  *Id.*  The employee, Kerry, recommended that petitioner take the form to where she was vaccinated and have the information be confirmed in their system and initialed to confirm the information was correct.  *Id.*

Petitioner stated that she made an appointment with Dr. Gaur, paid the $25.00 co-pay and Dr. Gaur reviewed the record and initialed the form twice after verifying the information on the form that petitioner had copied down was correct.  *Id.* at ¶ 6.  Petitioner stated that, "[Dr.Gaur's] signature validated amendments that included information contained in the original vaccine label as well as the injection site for where my vaccine was administered."  *Id.*

### c.  Petitioner's Vaccination Records

Petitioner filed two vaccination records in support of her claim.  Petitioner's Exhibit 8, is titled "Flu Vaccination Administration Record 2016-2017."  Pet. Ex. 8.  In the left corner, there is a sticker attached to the form which has petitioner's name, her birthdate, Dr. Sunita Gaur's name and the date "01/09/2017."  *Id.*  The next section on the document are screening questions, which are all marked as "no."  The form has petitioner's signature in the next section and date.  Under "Order" the "Fluzone P-free, 0.5 ml" was circled.  *Id.*  Then the administering nurse signed and dated the document at the bottom.  *Id.*  There was no place on the form for a notation for the site in which the vaccine was administered.

The second vaccination record filed as Petitioner's Exhibit 1.  This is the same form titled "EMR Flu Vaccine Administration Record 2016-2017."  Pet. Ex. 1.  It includes the same sticker in the left corner as Exhibit 8.  However, under the screening questions section, there is another label that covers the screening questions.  The sticker provides the lot number of the vaccine, the expiration date, that it was the "Quadrivalent" and that the information was "obtained from Kerry at Austin Regional Clinical at CIOX Health."  The sticker provides a phone number and a date that the information was received.  *Id.*  Next to petitioner's consent signature, is Dr. Gaur's initials and date marked "9/12/17."  *Id.*  Under the section for the type of vaccine administered, the Fluzone, P-Free, 0.5 ml is circled, but this time another typed sticker reads, "Injection site: left arm."  Dr. Gaur initialed and dated the bottom of the document as well, near the signature of the administering nurse.  *Id.*

Petitioner also filed a letter from Dr. Sunita Gaur.  Pet. Ex. 18.  The letter states, "In the matter of Janell Ross, the signature on the vaccine record is indeed my signature written on 9/12/2017."  *Id.*

### d.  Petitioner's Expert Report

Petitioner submitted an expert report by orthopedist, Dr. Lesley Anderson.  Pet. Ex. 14 (ECF No. 25).  Dr. Anderson reviewed petitioner's medical records and stated that petitioner had two diagnoses based on the review of the records.  *Id.* at 4.  She stated that petitioner had "acute bursitis following an influenza vaccination that developed into an acute adhesive capsulitis."  *Id.* Dr. Anderson explained that she has seen several cases of post-vaccination adhesive capsulitis and that there are "two to three cases that require treatment from physical therapy, oral corticosteroids, intra-articular steroids, and occasionally surgery."  *Id.*  Dr. Anderson noted that petitioner's injection was given in the lateral deltoid and stated that, "if too proximal, can be injected into the subacromial space or even rotator cuff causing inflammation or damage to this area."  *Id.* at 5.  She stated that, "These injections can enter the subacromial space…if angled improperly or injected too proximal."  *Id.*

The second diagnosis Dr. Anderson observed was "suprascapular neuropathy," documented by an EMG examination.  *Id.* at 5.  She stated that, "the most common etiologies of suprascapular neuropathy are traction from a massive rotator cuff tear, ganglion cyst in the area of the suprascapular notch or spinoglenoid notch, rarely infection such as post viral neuritis."  *Id.* at 5.  Dr. Anderson stated that suprascapular neuropathy is usually accompanied by significant atrophy of the supraspinatus and infraspinatus, which was not present in this case.  *Id.*  Dr. Anderson opined that, "there does not appear to be any clinical consequences of this diagnosis." *Id.*  She stated, "The findings on the EMG of the suprascapular neuropathy appear to be more of a "red herring" and that I do not see any consequences of the neuropathy such as weakness or atrophy noted in the supraspinatus or infraspinatus."  *Id.*

Dr. Anderson stated that, "The diagnosis of adhesive capsulitis following an influenza vaccine meets the Table criteria for SIRVA.  [Petitioner] had symptoms within 48 hours, there was no preexisting shoulder injuries, the symptoms are limited to her left shoulder, and there are no other conditions that would explain her symptoms."  *Id.*  Further, she stated, "The treatment that [petitioner] required was all focused on her stiffness, pain, and limitation of motion, all findings related to adhesive capsulitis, and unrelated to suprascapular neuropathy."  *Id.* She concluded her report by stating, "I believe that the vaccine caused the injury to her left shoulder resulting in an adhesive capsulitis, acute bursitis and some damage to the left deltoid as noted on her EMG."  *Id.*

### e.  Respondent's Expert Report

Respondent submitted an expert report from orthopedist, Dr. Paul Cagle.  Resp. Ex. A (ECF No. 53).  Dr. Cagle opined that petitioner's findings of "bursitis, shoulder pain, shoulder range of motion, axillary nerve function, the suprascapular nerve function, and the cervical

spine/neck pain are not correlated with the vaccination and were not caused by the vaccination." *Id.* at 6.

After reviewing her medical records, Dr. Cagle stated, "In regards to the time course, there is medical documentation associating the shoulder vaccination event with the onset of shoulder pain.  This was noted to have occurred within 48 hours, which would seem to satisfy the definition of SIRVA."  *Id.* at 2.  He continued, however, to assert that petitioner's shoulder pain had "resolved" and that it was not until "she performed the strenuous act of moving boxes that the pain in her shoulder reoccurred, and furthermore the pain was noted to have resolved again."  *Id.*

Dr. Cagle also acknowledged that petitioner was diagnosed with shoulder bursitis and treated with anti-inflammatory medications and physical therapy.  *Id.* at 3.  He argued that petitioner failed to establish "the actual injury mechanism."  *Id.*  Dr. Cagle wrote, "There is mention that she reported the pain was associated with the vaccination, but there is no mention of inappropriate technique."  *Id.* at 3-4.  He noted that, "The most common mechanism discussed in SIRVA literature is over penetration of the vaccination injection needle causing a mechanical injury and/or over penetration leading to the injection of the vaccine antigen/adjuvant into the bursa/tissue causing an immune reaction."  *Id.* at 4.  He argued that "It is not conceivable how a standard needle would have led to an over penetration event.  In addition there is no documentation of an inappropriate technique…"  *Id.*

Dr. Cagle stated that "Clinical and radiographic findings in the record also do not support a nerve injury.  A SIRVA nerve injury from an injection would be associated with immediate nerve dysfunction.  Never dysfunction from a sharp injury would involve immediate continual numbness and weakness and this injury occurs from the needle actually penetrating the nerve causing a mechanical injury."  *Id.* at 5.  He observed that there is no documentation of continual numbness in the entire medical record.  *Id.*  Dr. Cagle also explained that the MRI findings do not support the findings of a nerve injury as there were "no signs of muscle atrophy or muscle signal abnormality."  *Id.* at 5.  He argued that the MRI also does not support a SIRVA because "there is no demonstration of increased bursal fluid."  Citing to multiple articles, Dr. Cagle stated, "The SIRVA literature has demonstrated that patients with a SIRVA event have increased fluid signal and bursal fluid on MRI presentation.  Thus, it is highly inconsistent with what has been documented."  *Id.*  He argued that the "additional findings including partial tearing of the supraspinatus and small effusion of the acromioclavicular joint can all be associated with chronic age-related changes."  *Id.* at 5.

### III.   Legal Standard

#### A.  Finding of Fact

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.  Section 13(b)(1).  "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical

conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events." *Curcuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule does not always apply.  In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate."  *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998).  The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling."  *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).  The credibility of the individual offering such testimony must also be determined.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record."  *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B.  Entitlement

To receive compensation through the Program, petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that she suffered an injury that was actually caused by a vaccination. See §§ 300aa-13(a)(1)(A), 11(c)(1); *Capizzano v. Sec'y of Health & Human Servs.,* 440 F.3d 1317, 1319-20 (Fed. Cir. 2006).

In this case, petitioner alleges that she suffered a Table Injury.  Thus, petitioner must show that she suffered an injury of the type enumerated in the "Vaccine Injury Table,"

corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown by the government that the injury was caused by some other factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); §300aa-14(a); § 300aa-13(a)(1)(B).

SIRVA is an injury listed on the Vaccine Injury Table ("Table").  The QAI explains that, "SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.)." 42 C.F.R. 100.3(c)(10).  The SIRVA criteria under the Qualifications and Aids to Interpretation are as follows:

> A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following: (i) no history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

*Id.*  The flu vaccine is a covered vaccine, and the Table specifies that for a Table SIRVA, onset must occur within 48 hours.  *Id.* at § 100.3(a)(XIV)(B).

## IV.    Finding of Fact

Respondent stated that, "The site of administration is not documented in the contemporaneous medical records."  Resp. Response at 3.  In a footnote, respondent stated that, "the vaccination record has been discussed on multiple occasions by the parties and the Court….This special master has not issued a ruling on the site of vaccination."  *Id.* at 3, n. 6.

Petitioner has established by preponderant evidence that the flu vaccination she received on January 9, 2017 was administered to her left arm.  Importantly, the Flu Vaccine Administration record provided to petitioner, which she signed on the date of the vaccination, does not include a space for vaccine site administration.  *See* Pet. Exs. 1 & 8.  However, the document also states, "Please circle the type of vaccine administered and complete full documentation in the EMR," implying that the EMR (electronic medical record) will have additional information.  Petitioner's affidavit explains that when she spoke to an employee of Ciox Health, supplemental information was included in the EMR, but not accessible outside the system.  Further, petitioner's primary care physician, Dr. Gaur, who had seen petitioner on the date of vaccination and ordered the vaccine for petitioner, initialed the annotated vaccine record.  *See* Pet. Ex. 2 at 38 (Dr. Gaur order the Flu vaccine for petitioner).  As Dr. Gaur's office was

where the flu shot was administered, Dr. Gaur presumably had access to the full EMR, which included a notation as to which arm the flu shot was administered.

Additionally, petitioner consistently reports that she received the flu vaccine on her left arm to medical providers. *See* Pet. Ex. 2 at 43; Pet. Ex. 6 at 46; Pet. Ex. 4 at 41. Petitioner was reporting this information for diagnosis and treatment of a new ailment and as such, deserve to be given substantial weight. When petitioner returned to Dr. Gaur on January 25, 2017, she reported "left shoulder pain," since the flu shot. Pet. Ex. 2 at 43. Dr. Gaur performed an exam of petitioner's left shoulder and wrote, "Acute pain of left shoulder (primary), apparently symptoms started after she had the flu shot on 01/09/2017." *Id.* at 44. Dr. Gaur, having full access to petitioner's medical record, including on the day petitioner received the vaccine, attributed the onset of petitioner's pain in her left shoulder to the flu vaccine received on January 9, 2017. Further, other medical records demonstrate that petitioner experienced pain and reduced range of motion in her left shoulder. *See* Pet. Ex. 6 at 2; Pet. Ex. 5 at 14; Pet. Ex. 2 at 44; Pet. Ex. 4 at 41.

Based on the record as whole, I find that petitioner demonstrated by preponderant evidence that she received the flu vaccination on January 9, 2017 in her left arm.

## V.   Entitlement

### a.   No history of pain, inflammation or dysfunction of the affected shoulder.

There is no evidence in the medical record to suggest that petitioner had experienced any pain or dysfunction in her left shoulder prior to receiving the vaccination at issue. Further, respondent has made no argument on this criterion. Resp. Response at 17. Additionally, petitioner's expert, Dr. Anderson, who reviewed petitioner's medical records, noted that petitioner had no preexisting left shoulder injuries. Pet. Ex. 14 at 5. As such, petitioner has met this criterion by preponderant evidence.

### b.   Pain occurs within the specified timeframe (48 hours).

Petitioner received the flu vaccine on January 9, 2017. Pet. Ex. 8 at 1; Pet. Ex. 9 at 5. On January 24, 2017, petitioner contacted her primary care physician, Dr. Gaur, and reported she had been experiencing "left arm pain following [the] flu shot on 1/9." Pet. Ex. 2 at 41. Petitioner reported that her "pain started 1 day after injection," and that "she could barely move [her] arm." *Id.*

When petitioner was seen by Dr. Gaur on January 25, 2017, the reason for visit was recorded as, "left shoulder pain and numbness since flu vaccine x 2 weeks." *Id.* at 43. Petitioner reported to Dr. Gaur at the appointment that she has "pain and stiffness of the left shoulder since 1/10/2017." *Id.* The "History of Present Illness" section states, "She had a flu shot in the arm on 01/09/2017. States that she had a sore arm that day the following day. The pain in the arm and stiffness persisted the following few days and then started to get better. As she started to do her normal household activities the pain and stiffness returns." *Id.* Dr. Gaur diagnosed her with

"Acute pain of left shoulder (primary), apparently symptoms started after she had the flu shot on 01/09/2017.  Examination consistent with acute bursitis."  *Id.* at 44.

On January 27, 2017, at petitioner's first physical therapy evaluation, petitioner again reported left shoulder pain following the flu shot.  Pet. Ex. 4 at 41.  When petitioner had her first appointment with Dr. Jeffrey Padalecki on March 8, 2017, petitioner again reported that her left shoulder "pain began in January after she had a flu shot given to the left shoulder."  Pet. Ex. 2 at 50.  On April 4, 2017, petitioner again reported that she had experienced left shoulder pain since the day of her vaccination.  Pet. Ex. 6 at 10.

Additionally, both experts in this case acknowledge that petitioner experienced pain and dysfunction within 48 hours of receiving the flu vaccination on January 9, 2017.  Dr. Cagle wrote, "In regard to the time course, there is medical documentation associating the shoulder vaccination event with the onset of shoulder pain.  This was noted to have occurred within 48 hours, which would seem to satisfy the definition of a SIRVA."  Resp. Ex. A at 3.  Dr. Anderson, petitioner's expert, agreed and stated that petitioner "had symptoms within 48 hours."  Pet. Ex. 14 at 5.

Petitioner consistently associated the onset of her left shoulder pain to medical professionals.  Further, experts from both parties agree that the record establishes that petitioner's onset began within 48-hours of vaccination.  As such, petitioner has established by preponderant evidence that she experienced pain and shoulder dysfunction within 48-hours of receiving the flu vaccine on January 9, 2017.

### c.  Pain and reduced range of motion confined to the shoulder.

Respondent argues that petitioner's pain and reduced range of motion were not limited to her left shoulder, as she complained of numbness in her arms and fingers.  Resp. Response at 17-18.  Respondent stated that petitioner's initial EMG was inconsistent with SIRVA and displayed evidence of suprascapular neuropathy.  *Id.* at 18.

In her reply, petitioner argued that respondent's assertions that petitioner's injury was not limited to her left shoulder are unsupported by the record.  Pet. Reply at 2.  Petitioner stated that respondent's assertion is based on a single record from neurologist, Dr. Fernandez, from April 10, 2017.  *Id.* at 2.  Petitioner also stated that all of petitioner's other treating physicians focused their treatment on her left shoulder.  *Id.*  Additionally, petitioner asserted that her expert, Dr. Anderson, stated that petitioner's symptoms were limited to her left shoulder and that the EMG finding of "suprascapular neuropathy appear to be more of a "red herring"" and that she did not see any evidence of neuropathy such as weakness or atrophy.  Pet. Ex. 14 at 5.

After petitioner received the flu vaccination on January 9, 2017, she reported to her primary care physician, Dr. Gaur, that she had "pain and stiffness of the left shoulder since 01/10/2017."  Pet. Ex. 2 at 43.  Her neurological exam that day was normal.  *Id.* at 44.  During the focused exam of petitioner's left shoulder, Dr. Gaur observed "slight tenderness over the proximal deltoid close to the joint.  Decreased range of motion in all direction[s], primarily abduction and extension due to pain."  *Id.* at 44.  He diagnosed petitioner with acute bursitis.  *Id.*

13

Her orthopedist, Dr. Padalecki, noted that petitioner had "significant left shoulder pain," and she described the pain as severe, exacerbated by quick movements or sideways motions. *Id.* at 50. He specifically noted that petitioner "denies numbness or weakness." *Id.* After a physical exam, where he observed positive impingement testing and pain with flexion, Dr. Padalecki diagnosed petitioner with left shoulder bursitis. *Id.* at 52. Dr. Padalecki also speculated that petitioner could have "early frozen shoulder." *Id.*

Even petitioner's physical therapy was focused on improving movement in her left shoulder. *See* Pet. Ex. 4 generally. When petitioner was evaluated by Dr. Carey Windler on April 4, 2017, petitioner explained that she experienced pain in her left shoulder following the flu vaccination and "the inability to move the arm," the day following the vaccination. Petitioner did not report any numbness, but focused her reporting of symptoms to her left shoulder. Additionally, Dr. Windler performed a focused physical exam on petitioner's left shoulder, which revealed slight deltoid atrophy, limited active abduction, limited external and internal rotation, and tenderness over the lateral aspect of the shoulder overlying the mid one-third of the deltoid. *Id.* at 10. Dr. Windler diagnosed petitioner with "left shoulder pain," and "possible deltoid/axillary nerve injury." *Id.* Dr. Windler recommended an EMG.

When petitioner had a consult with Dr. Fernandez on April 10, 2017, she again reported left should pain following the flu vaccination. Pet. Ex. 6 at 27. At this appointment, petitioner reported pain and the "feeling of instability," in addition to "intermittent numbness in her fingers." *Id.* Dr. Fernandez also recorded that petitioner explained she had "one episode of numbness in the entire left arm that lasted a couple of minutes." *Id.* The EMG/NCS finding was, "Needle EMG of the LUE showed membrane instability in the left supraspinatus and infraspinatus neuropathic motor unit potentials. The left deltoid only showed decreased recruitment without axonal denervation. All remaining muscles (as indicated in the following table) were normal." *Id.* at 28. Dr. Fernandez's impression was left suprascapular neuropathy and decreased recruitment without axonal denervation in the left deltoid. *Id.* Further, under "Plan," he stated, "Only seeing abnormal spontaneous activity in the left supra-and infraspinatus muscles that would be consistent with a suprascapular nerve impingement. No axonal denervation in the deltoid. This seems less likely related to a cervical radiculopathy given lack of abnormalities in other C5-6 muscles." *Id.*

Despite these findings, Dr. Windler recommended petitioner have an MRI. On April 14, 2017, petitioner had an MRI of her left shoulder, which showed, "Thickening of the anterior band of inferior glenohumeral ligament and signal abnormality in the rotator interval highly suggestive of adhesive capsulitis and a partial interstitial tear of the conjoined tendon involving the posterior fibers of the supraspinatus tendon and the anterior leading edge of the infraspinatus tendon at their junction." Pet. Ex. 5 at 3. On April 19, 2017, petitioner saw Dr. Windler again. After reviewing petitioner's MRI and performing an examination of her left shoulder, Dr. Windler diagnosed petitioner with "left shoulder pain with findings [consistent with the MRI] and early arthrofibrosis. Pet. Ex. 6 at 8. Under "Plan," Dr. Windler wrote, "Her symptoms are secondary to pain post flu injection, potential neurological changes, and subsequent development of arthrofibrosis. I recommended a trial of intraarticular corticosteroid injection coupled with physical therapy and home exercises." *Id.* Petitioner received a steroid injection on April 27, 2017. *Id.* at 39.

14

On November 14, 2018, petitioner had a follow-up appointment with Dr. Fernandez. At this appointment, Dr. Fernandez performed a second EMG/NCV study. Pet. Ex. 17 at 1. The impression was, "Normal electrodiagnostic study of the left upper extremity. There is no electrodiagnostic evidence of cervical radiculopathy or nerve entrapment. The previous suprascapular neuropathy has resolved and is not seen on today's study." *Id.* Under "Plan," Dr. Fernandez stated, "Symptoms seem to be related to her joint capsule…" *Id.*

The medical records demonstrate that petitioner was consistently and predominately being treated for left shoulder pain and dysfunction following the flu vaccination on January 9, 2017. Petitioner's report of numbness only appeared one time in the record and it was reported as "intermittently." Further, the treatment that petitioner received is consistent with other SIRVA cases seen in the program. *See Rayborn v. Sec'y of Health & Human Servs.,* No. 18-226, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (petitioner received one cortisone injection and had 13 physical therapy sessions as a result of a left shoulder injury following flu vaccination); *Dhanoa v. Sec'y of Health & Human Servs.,* No. 15-1011, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (petitioner underwent 23 physical therapy sessions and received two cortisone injections as a result of a right shoulder injury following flu vaccination); *Binette v. Sec'y of Health & Human Servs.,* No. 16-731, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (petitioner received two cortisone injections and underwent 18 physical therapy sessions as a result of a left shoulder injury following the flu vaccination); *Desai v. Sec'y of Health & Human Servs.,* No. 14-811V, 2020 WL 8768069 (Fed. Cl. Spec. Mstr. Dec. 21, 2020) (petitioner received one steroid injection and underwent over 50 sessions of physical therapy due to a right shoulder injury following the flu vaccination); and *Lang v. Sec'y of Health & Human Servs.,* No, 17-995V, 2020 WL 7873272 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (petitioner received a steroid injection in the subacromial space and she underwent 8 physical therapy sessions due to a right shoulder injury following the flu vaccination).

Petitioner's expert, Dr. Anderson, called the findings on the EMG of suprascapular neuropathy a "red herring," and that she did not see any clinical consequences for this diagnosis. Pet. Ex. 14 at 5. She noted that petitioner did not have any weakness or atrophy of the supraspinatus and infraspinatus, which would typically accompany suprascapular neuropathy. *Id.* Respondent's expert, Dr. Cagle stated, "Clinical and radiographic findings in the record also do not support a nerve injury. A SIRVA nerve injury from an injection would be associated with immediate nerve dysfunction….There is no documentation of continual numbness in the entire medical record. There is documentation of intermittent numbness, but intermittent symptoms are not consistent with a sharp injury to a nerve." Resp. Ex. A at 5. Dr. Cagle continues, stating, "The MRI findings also do not support the findings of a nerve injury as there is no signs of muscle atrophy or muscle signal abnormality." *Id.*

It does not appear that petitioner's report about intermittent numbness in her arm and hand at one medical appointment, changed petitioner's diagnosis or treatment for her left shoulder injury. The experts agreed that a nerve injury would have resulted in immediate nerve dysfunction and that petitioner's symptoms were not consistent with a nerve injury. As such, petitioner has presented preponderant evidence that her pain and reduced range of motion was confined to her left shoulder.

### d.  No other condition or abnormality explains petitioner's symptoms

Finally, respondent makes multiple arguments that petitioner's shoulder injury was caused by something other than the flu vaccination she received on January 9, 2017.  The first is that petitioner's initial EMG demonstrated that suprascapular neuropathy was the cause of her left shoulder pain.  The second argument was that petitioner's initial pain and dysfunction was "transient" and "resolved within days," until she moved boxes around and vacuumed, which was the cause of petitioner's injury.  Resp. Response at 17.  Respondent also argues that petitioner's MRI displayed an injury of the posterior infraspinatus and supraspinatus tendon and that her MRI did not demonstrate increased fluid signal and bursal fluid, and was therefore inconsistent with SIRVA.  *Id.* at 18.

As noted in the previous section, both of the experts agree that petitioner did not suffer a nerve injury.  Specifically, respondent's expert, Dr. Cagle stated very clearly, "Clinical and radiographic findings in the record also do not support a nerve injury.  Nerve dysfunction from a sharp injury would involve immediate continual numbness and weakness."  Resp. Ex. A at 5. Dr. Anderson agreed with Dr. Cagle and stated, "The findings on the EMG of the suprascapular neuropathy appear to be more of a "red herring" and I do not see any consequences of the neuropathy such as weakness or atrophy noted in the supraspinatus or infraspinatus."  Pet. Ex. 14 at 5.  Dr. Anderson further opined that, "The treatment that petitioner required was all focused on her stiffness, pain, and limitation of motion, all findings related to the adhesive capsulitis and unrelated to suprascapular neuropathy."  *Id.*  Finally, the medical record demonstrates that the initial supraspinatus neuropathy seen on the EMG from April 2017 was no longer present in the EMG performed in November 2018 while her shoulder symptoms continued.  Thus, respondent's argument that petitioner's left shoulder pain was caused by suprascapular neuropathy and not the vaccine is not supported by the medical records or the opinions of the experts.

Respondent also argued that petitioner's symptoms were caused by moving boxes, after her initial pain and dysfunction resolved.  Resp. Ex. A at 3.  Dr. Cagle stated that petitioner's pain did occur within 48 hours, but then "resolved."  *Id.*  He asserts that her pain did not return until she was moving boxes again, but then the pain resolved again, and then re-occurred when she was vacuuming.  *Id.*  Dr. Cagle referred to petitioner's symptoms as "transient," and inconsistent with SIRVA.  The term "transient" implies that petitioner's symptoms only lasted a short period of time and that they were impermanent, when the record demonstrates that the petitioner's symptoms became permanent after they were initiated by the vaccination on January 9, 2017.

The only reference to moving boxes was in a phone call to her primary care doctor's office on January 24, when a nurse recorded that she had shoulder pain following the flu shot and that she could barely move her arm.  The note indicated that the pain resolved and on 1/13 she was helping move boxes and the pain returned as it had been after the flu shot.  She indicated another lessening of pain and then return when vacuuming a couple days later.  However, when she saw Dr. Gaur the following day complaining of left shoulder pain since 1/10/2017, Dr. Gaur recorded that she said; The pain in the arm and stiffness persisted the following few days (after the flu shot) and then *started to get better*. As she started to do her normal household activities

the pain and stiffness returns.  Stated she did not have any problem with the shoulder prior to the flu shot.

It stands to reason that her shoulder was likely inflamed, with later documented evidence of acute bursitis, and that caused her to be susceptible to increased pain upon resumption of normal activities. All subsequent medical records consistently attribute the continual shoulder pain to the flu shot with onset the day following the shot.  The medical records show that petitioner had continuous shoulder dysfunction and pain for at least three years post-vaccination with the development of adhesive capsulitis secondary to the initial SIRVA injury.  Thus, respondent's argument that petitioner's shoulder dysfunction was caused by moving boxes or vacuuming seems highly unlikely as routine activities of daily living would not likely cause such pain absent the underlying inflammation caused by the flu shot. It is more likely that she suffered a transient increase in her pain when doing these tasks but that inflammation from a SIRVA injury was the underlying cause of the injury that continued for at least several years.

Finally, respondent's contention that petitioner's MRI was inconsistent with SIRVA and more suggestive of degenerative changes is unsupported by the medical literature on SIRVA that was submitted by respondent in this case and the medical literature respondent relied upon when adding SIRVA to the Vaccine Injury Table.

The *S. Atanasoff* article, which respondent filed in this case, and respondent relied upon when creating the QAI for SIRVA states:

> In general, chronic shoulder pain with or without reduced shoulder joint function can be caused by a number of common conditions including impingement syndrome, rotator cuff tear, biceps tendonitis, osteoarthritis and adhesive capsulitis.  In many cases these conditions may cause no symptoms until provoked by trauma or other events.  Reilly et al. reviewed a series of shoulder ultrasound and MRI studies obtained in asymptomatic persons past middle age and found partial or complete rotator cuff tears in 39% of those individuals.  There, some of the MRI findings in our case series, such as rotator cuff tears, may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation.

Resp. Ex. A, Tab 2 at 3.[6]  In this case, petitioner was 65 years-old when she received the vaccine at issue.  Her MRI found partial interstitial tear of the conjoined tendon involving the posterior fibers of the supraspinatus tendon and the anterior leading edge of the infraspinatus tendon at their junction and thickening of the anterior band of the inferior glenohumeral ligament and signal abnormality in the rotator interval "highly suggestive of adhesive capsulitis."  Pet. Ex. 5 at 3.  None of petitioner's treating providers mentioned "degenerative changes" as the cause of her shoulder pain.  *See* Pet. Ex. 6 at 8; Pet. Ex. 2 at 84.  Instead, they associated petitioner's shoulder pain with being caused by the flu vaccine.  *Id.*

Additionally, petitioner's diagnosis of adhesive capsulitis, which is well-documented in the medical records, is a diagnosis consistent with many other SIRVA cases in the program.  *See*

---

[6] S. Atanasoff et al., *Shoulder injury related to vaccine administration (SIRVA),* 28 Vaccine 8049, 8051 (2010). [Resp. Ex. A, Tab 3].

*Gurney v. Sec'y of Health & Human Servs.,* No. 17-481V, 2019 WL 2865490, at *7 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (finding that the "timing and course of petitioner's adhesive capsulitis remains consistent with a post-vaccination sequela to her SIRVA as described in the [Atanasoff study]."); *O'Leary v. Sec'y of Health & Human Servs.,* No. 18-584V, 2021 WL 3046617, at *11 (finding that petitioner's diagnosis of adhesive capsulitis is consistent with SIRVA).

As such, I find that petitioner has demonstrated by preponderant evidence no other condition or abnormality explains petitioner's post-vaccination symptoms.

### e.   Factors unrelated to vaccination

Once petitioner has established her *prima facie* burden of demonstrating a Table injury, respondent may still prove the condition is "due to factors unrelated to the administration of the vaccine described in the petition." § 300aa-13(a)(1)(B). In this case, respondent has not raised any issue of factors unrelated to vaccination apart from what is discussed above. I do not find that the respondent has proved by a prepondance of he evidence that any of the other transient issues discussed above including the subscapular neuropathy, or re-activation of her post vaccination shoulder pain within several days of onset by activities of daily living including moving boxes or vacuuming were the cause of her shoulder pain.

### VI.   Conclusion

For the reasons discussed above, after evaluating the evidence of record within the context of this program, I find preponderant evidence that petitioner suffered a SIRVA Table Injury following her January 9, 2017 flu vaccination as alleged. A separate damages order will be issued.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master